Per curiam

Where a case is so circumstanced that a Couit of Law can give as complete redress asa Court of Equity can, a Court of Equity should not interfere with it — now the circumstances stated here, are such as are properly cognizable in a Court of Law, and with respect to which a Court of Law can give as complete redress to the party injured, as a Court of Equity could. The court decided in this case according to the, case of Timms and Potter, which must now be taken and is taken, as a *268 tJecis¡on establishing the rule of law on this subject. It is a very great mistake to suppose, a Court of Equity can decide against the rules of property established by judicial decisions. The Court of Equity is as much bound to observe them as a Court of Law is. If the decision was wrong the Court of Law might have granted a new trial : and if ever a court for correcting errors should be established, the wrong decision, if any there be, may be a subject for the jurisdiction of that court? but the Court of Equity must not undertake to act as a court for correcting erroneous judgments. — So the bill was dismissed for want of Equity.
Note. — The case of Timms and Potter, so often cited in actions for the increase of slaves, was decided at Hillsborough three or fouriyears after the wav. It is a leading case, and governs a vast deal of the properly of this country •, and therefore it may not be improper to subjoin the substance of it in this place.
Glover gave a negro woman to his daughter, but reserved the use of the negro during his life. There was afterwards a judgment against Glover, and an execution, arid the wench sold to satisfy it — Potter becoming the purchaser. Timms, the husband of the daughter, after the death of Glover, sued for the wench and her children. The Plaintiff had a verdict, and a special case was made as to the children born in the lifetime of Glover.
This special case was several times argued, the Defendant’s counsel citing and relying upon the cases that decide the interest of money accruing during the particular estate, to belong to the owner for that time or cestui que use; and also 2 Bl. Com. 396. Puff. lib. 2, c. 4, p. 11.
After time taken to consider from one term to another, the court decided and gave their opinion at length— SpeNCBr and Ashe being only present, Judge Wix-mams being absent, but of a different opinion.
They said the remainder carried with it the increase, and vested the property of the wench in the remainder man ; and there was left in the owner for life, only the use and possession, which use entitled him to the labour of the wench and nothing more. The increase went to the remainder man, to compensate for the deterioration of the wench, by age, labour and breeding, whilst in the service of the owner for life. This rule, they said, had prevailed ever since the first settlement of the country. It had been constantly understood to be the law. The *269 practice of tbe country had been conformable to it. It was a convenient rule, as it enabled owners of such pro-perfy more easily to provide.lor their families, in ttie distribution of it, and for these reasons it should not now be broken in upon. So there was judgment for the Plaintiffs, as to the children also.
Since this decision, when the case of Glasgow and Flowers occurred, the counsel for Glasgow, considering the principles of the English common law, with respect to the increase of animals tfsat were the subjects of property ; and also that this decision was made by two Judges only, against the opinion of a third, had intended again to bring this point in question, and lie enquired diligently of the oldest practitioners he was acquainted with, whether there had ever been any judicial determination against that of Timms and Potter. The result was, that he could hear of no such decision ; whence it is reasonable to conclude, there have not been any, and that the court in the case of Timms and Potter, were founded in saying that the rule had always been understood in this country from its first settlement, as they then decided it to be; and as certainty in the laws, is of much more consequence in general, than the modification of a rule, the opinion of the public in its favour for so great a length of time, is in such case, where the law is not clear to the contrary, a very good ground for deciding as the court did in the case of Timms and Potter; and as that decision adds an adjudged case to common opinion, it would be very imprudent for the Judges now to disturb it. It, is indeed not certainly known, why this opinion was first entertained in this country, and adopted afterwards, since the rule with respect to all other animals is different even in this State ; for if other animals be leased for years, and breed in the mean time, the lessee shall have the young as a part of the use. 2 Nels. Ab. 1104. Godd. 113. 3 Ba. Ab. 300. Lev. 42. Allen 139. 2 Bulst. 17. Dyer 56, a, 110, 212, b. Bro. Leases 23. The rule of the civil law is the same. 1 Domat. lib. 1, tit. 11, secd. 3. The. property of the animals leased remains in the lessor, so that he may maintain an action if the lessee kill them. Upon principle therefore*, it is not a sound action to say that because the property is in the remainder man, and the use only in the owner forlife, that the increase necessarily must belong to the remain- *270 ^er man. It is a conclusion that by no means results from the premises. It is a conclusion that is not drawn from such premises in other countries, where slavery has been introduced, it is the settled law ot‘ Maryland, that negro children horn of a mother given to A. for life, and after his death to B. in the lifetime of A. do belongto A. unless -the increase, are also given over by express words. Vide Deputy Commissary Guide. published by Valette, p. 91. That this is the. law of Maryland is confirmed by the opinion of a lawyer of that State of the first, eminence, taken on the occasion of this suit of Glasgow and Flowers, who says it is a rule of the greatest notoriety there, that the increase in jhe case above stated, belongs to the owner for life or usufructuary ; and that the decisions in Maryland have been so uniformly to that effect, that the question would not now bear an argument there.It is of no real use to investigate the origin of the rule adopted and confirmed by the case of Timms and Potter, as such an investigation could only fend to gratify inquisitive and perhaps idle curiosity ; but it would not be a matter of difficulty to (race its origin with some degree of probability. This country, though it began to be settled as early as the year 1668, it is to be presumed, had not come under an established government, having courts for the regular and constant administration of the laws, till about the beginning of the present century. The. first acts of the Legislature that appear in our statute hook, were made in the. latter part of the year 1715, though there are judicial records purporting to proceed npon acts passed in the year 1712. It is probable, and indeed it is a fact very generally admitted, that this country in its infancy, was for the most part settled by emigrants 'from Virginia, who, as all other emigrants do, brought with them the customs and legal notions of the country they left. Every one who has practised in North-Carolina, will be immediately satisfied with this observation, if he will but recollect how many legal notions, borrowed from the Jaw s of Virginia, are yet current amongst the inhabitants of (bis counfrj. The law of Virginia of the' year 1703, made slaves in many respects real property, annexed them to the lands of the owners, thereby placing them in the eondirion of the ancient villains in England, who were adscriptitice gleboe, and went, as also did their posterity, to the absolute proprietor of the land. The *271 act of 1705 expressly considered, the increase as a pari of the inheritance that belonged to the heir, and provided that the tenant in dower, or usufructuary owner, should not remove them put of the country. 1705, c. 23, s. 10. Salk. 666, pl. 1. Hence, it is not improbable, arose the idea first entertained in this country, that the increase of slaves h'eTonged to the absolute proprietor, exclusive of the claim of temporary owners or usufructuaries $ and that idea, for want of examining its foundation, having once become general, the inhabitants of rhe country began to act under- it, in making their contracts, wills and settlements as provisions for their families ; and probably continued to do so, until at length, it became dangerous and fraught with mischievous and unjust consequences to attempt the establishment of a different rule, or the true one — and the courts were necessitated, as they have been in some other instances, to permit common error to make the law. Thus, what at first was but a crude, opinion,without any legal foundation, hath in process of time and by long usags;, been adopted into the body of our laws, as a fixed and settled rule of property. This seems to be a more rational mode of accounting fos- the rule laid down in Timms and Potter, than that which seeks to support it «pop principles of the common law — all of which, so far as they can he traced, or as they afford any deductions that can be rationally inferred from them, are certainly repugnant to the rule established in Timms and Potter.
Note. — Upon the subject of jurisdiction of Equity, see Perkins v. Ballinger, post 367 Brickell & Green v. Jones, 2 Hay. 357. Fish v. Lane, Ibid. 342. Thorn & Wife v. Williams, 1 Car. Law Rep. 362, Long v. Merrill & Beard, N. C. Term Rep. 112. Littlejohn v. Patillo, 2 Hawks 302 Davidson v. Nelson, Ibid 113. Peace v. Nailing, 1 Dev. Eq. Rep. 289. The point relative to the increase of slaves belonging to the remainder man is-fully sustained by the case of Erwin & others v. Kilpatrick & others, 3 Hawks 456.